# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

TONY ESCOBAR,                            §
                                         §
          *Petitioner*,                  §
                                         §
v.                                       §          CIVIL ACTION NO. H-19-3746
                                         §
BOBBY LUMPKIN,                           §
                                         §
          *Respondent.*                  §

## MEMORANDUM OPINION AND ORDER

Petitioner, a state inmate represented by counsel, filed a section 2254 habeas petition challenging his 2014 conviction and life sentence for capital murder.  Respondent filed a motion for summary judgment (Docket Entry No. 8), to which petitioner filed a timely response in opposition (Docket Entry No. 11).

Having considered the motion, the response, the record, and the applicable law, the Court GRANTS the motion for summary judgment and DISMISSES this lawsuit for the reasons shown below.

### *Background and Claims*

A jury convicted petitioner of capital murder in June 2014, and he was sentenced to life imprisonment.  The conviction was affirmed on appeal, and discretionary review was refused.  *State v. Escobar*, No. 01-14-00593-CR, 2015 WL 6550733 (Tex. App.— Houston [1st Dist.] 2015, pet. ref'd).

Petitioner filed a *pro se* application for state habeas relief with the trial court on September 9, 2016, raising claims for ineffective assistance of counsel. The Texas Court of Criminal Appeals denied the application without a written order on the findings of the trial court on December 14, 2016. Petitioner filed a second application for state habeas relief through counsel on August 15, 2018, asserting the *Brady*[1] claim raised in this federal habeas petition. The Texas Court of Criminal Appeals dismissed the application as an abuse of the writ on December 12, 2018.

Petitioner reasserts his *Brady* claim in this federal proceeding. He argues that the State withheld evidence of the lengthy mental illness, medication, and suicide attempts of its material witness, Amber Thornton, in violation of *Brady*, and that but for this violation, he would not have been found guilty of capital murder.

Petitioner acknowledges that the *Brady* claim is unexhausted and procedurally defaulted. At issue in this lawsuit is whether petitioner has shown either cause and prejudice or a fundamental miscarriage of justice allowing his claim to go forward.

### Factual Background

A jury found petitioner guilty of capital murder for intentionally causing the death of complainant Russell Lopez during the commission of an aggravated robbery. In affirming the conviction, the intermediate court of appeals set forth the following statement of facts:

---

[1]*Brady v. Maryland*, 373 U.S. 83 (1963).

On the evening of December 20, 2011, Russell Lopez was at home taking care of his seven-year-old son, Caden, his six-year old niece, Bailey, and his nine-month-old daughter, Julianne. Lopez's wife, Marie, and his cousin, Shonte Mabe, were at work together. When they got off work shortly after 9:00 that night, Marie tried calling Lopez twice, but was unable to reach him. Mabe gave Marie a ride home. When they pulled up to Marie's house, they noticed that Lopez's black Tahoe was not in the driveway.

Upon entering the home, they found that their house had been ransacked and Marie's nine-month-old daughter was sitting on the couch unattended. Lopez was found lying on the bedroom floor covered in blood. While Mabe called 911, Marie went to Caden's bedroom to check on the children. Marie found the children in Caden's bedroom. Both Caden and Bailey were unharmed, but their hands and feet had been bound together with Julianne's baby clothes. While Marie was in the children's bedroom, the 911 dispatch operator instructed Mabe to confirm that Lopez was not breathing. Lopez's face was so distorted that he was unrecognizable. Due to the severe nature of the injuries to Lopez's face, Mabe was unable to perform CPR.

Paramedics arrived and declared Lopez dead on the scene. A sword was laying across his left chest and arm. There was a large concentration of blood on the floor of the dining room area, as well as bloody trails on the carpet leading to Lopez's body, indicating that his body had been dragged from the dining room to the bedroom. Various items had been removed from the home, including a television, a game system, jewelry, and Lopez's vehicle.

On December 22, Lopez's missing Tahoe was found partially submerged in a large body of water within a wooded area near Katy. The part of the vehicle that had not been submerged had been burned. Inside the vehicle, crime scene investigators with the Harris County Sheriff's Office recovered a cell phone, a shotgun shell, and a lighter.

Sergeant Craig Clopton spoke with people in the neighborhood and developed two potential suspects, Amber Thornton and Joseph Facundo. On December 28th, Clopton interviewed Thornton, who consented voluntarily to the interview, at the homicide department. Based on information he received from Thornton, Clopton also developed appellant as a suspect.

Clopton produced photo arrays containing pictures of the three suspects and showed them to Caden. Caden identified Thornton, Facundo, and appellant.

Clopton then sought capital murder charges against appellant, and an arrest warrant was issued for his arrest.

On December 30th, appellant and Facundo were apprehended in Laredo, where they were attempting to cross the border into Mexico.

\*   \*   \*   \*

At appellant's trial, Thornton testified as a witness for the State. According to Thornton, Lopez was the neighborhood drug dealer. On the evening of December 20, 2011, Thornton went to the vacant house next door to her home to get high. She found that Facundo and appellant were already at the vacant house smoking marihuana. Thornton testified that they spent the next 20 to 30 minutes discussing a plan to rob Lopez to get money and drugs. They planned to enter Lopez's home under the pretense of selling him a laptop, which appellant had brought to the vacant house, in exchange for three bags of cocaine worth $20.00 each. Once inside, Facundo would hit Lopez over the head with a hammer, appellant would tie up the children, and they would steal Lopez's property and his Tahoe.

Facundo called Lopez and arranged for the "sale" of the laptop. Then they walked to Lopez's house, and he let them inside. Facundo was carrying the hammer in his pocket. Thornton testified that Lopez was sitting at the dining room table feeding his infant daughter. Caden and Bailey were also present, but Lopez told them to go to the back room. Appellant set the laptop on the table and grabbed the cocaine. Then Facundo pulled the hammer out of his pocket and struck Lopez in the back of the head. Lopez fell to the ground, and Facundo continued to repeatedly strike him with the hammer.

Thornton testified that the baby began crying, so she picked her up from the highchair and held her while appellant went to Caden's room and tied up the other children. Facundo started grabbing televisions, guns, laptops, drugs, and money. Appellant and Facundo loaded the stolen items into the appellant's Tahoe, while Thornton held the baby. Appellant and Facundo grabbed Lopez by the hands and dragged his body into the bedroom. Then, Facundo retrieved an ornamental sword from Lopez's bedroom. Facundo and appellant were standing over Lopez's body, and Facundo was about to stab Lopez with the sword when he told Thornton to look the other way. Thornton testified that she did not watch what happened in the bedroom; instead, she walked over to the couch and set the baby down.

4

Then they drove the Tahoe to the vacant house and hid the stolen property in the attic. Facundo told Thornton that he and appellant discarded the Tahoe at a lake known locally as "The Cliffs." Thornton testified that she sold some of the jewelry that she had stolen from Lopez's house. Thornton, Facundo, and appellant also took a safe stolen from the Lopez's home to a neighborhood friend named David Tillman. Tillman managed to open the safe, but they only found legal papers inside. Tillman later provided the stolen safe to Sergeant Clopton.

Roger Milton, Jr., Assistant Medical Examiner for Harris County, testified regarding Lopez's autopsy results. Milton explained that Lopez had extensive blunt and sharp force injuries primarily of his head and neck region and some on the front of his chest. Milton also observed the presence of two narrow objects penetrating into the soft tissue in what he referred to as potentially chop injuries. The injuries to complainant's face were extensive and very destructive with fractures. Milton also observed perforating wounds on Lopez's body, including a stab wound to the right upper chest that went through his lung. Milton testified that a sword shown to him (State's exhibit No. 94) was capable of inflicting the type of injuries sustained by the complainant. He indicated that there was very little hemorrhage along the wound track indicating that the injury was consistent with either a peri-mortem (around the time of death) or even postmortem injury. Milton opined that the complainant's cause of death was multiple blunt and sharp force injuries of the head, neck, and chest. He determined that the manner of death was homicide.

Lopez's son, Caden, testified that on the evening of December 20, 2011, he saw his father sitting at the kitchen table feeding his sister Julianne, and there were two men standing behind him. His father told him to go back to his room. Approximately 10 minutes later, a man entered his room carrying Julianne's baby clothes and said "we're going to play cops and robbers." The man used the baby clothes to tie his legs together and to tie his hands behind his back. The man also tied up his cousin, Bailey. Then the man said "If I hear a noise, I'm going to bring a dog in here." After the man left, Caden cracked the bedroom door open and saw the two men and woman rummaging around in the kitchen. Caden estimated that he waited approximately 30 minutes before his mother came home from work and found him.

The following day, Caden was taken to the Children's Assessment Center to be interviewed. Sergeant Clopton showed him pictures and asked him to identify the people that were in his home that night. Caden circled appellant's

photograph and identified him as the man that tied him up. Caden also made an in-court identification of appellant.

The jury found appellant guilty of capital murder as charged in the indictment.

*Escobar*, 2015 WL 6550733, at *1–3.

### *The Applicable Legal Standards*

*Habeas Review*

This petition is governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). 28 U .S.C. § 2254. Under AEDPA, federal habeas relief cannot be granted on legal issues adjudicated on the merits in state court unless the state adjudication was contrary to clearly established federal law as determined by the Supreme Court, or involved an unreasonable application of clearly established federal law as determined by the Supreme Court. *Harrington v. Richter*, 562 U.S. 86, 98–99 (2011); *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000); 28 U.S.C. §§ 2254(d)(1), (2). A state court decision is contrary to federal precedent if it applies a rule that contradicts the governing law set forth by the Supreme Court, or if it confronts a set of facts that are materially indistinguishable from such a decision and arrives at a result different from the Supreme Court's precedent. *Early v. Packer*, 537 U.S. 3, 7–8 (2002).

A state court unreasonably applies Supreme Court precedent if it unreasonably applies the correct legal rule to the facts of a particular case, or unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply.

*Williams*, 529 U.S. at 409.  In deciding whether a state court's application was unreasonable, this Court considers whether the application was objectively unreasonable.  *Id*. at 411.  "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."  *Richter*, 562 U.S. at 102.  As stated by the Supreme Court in *Richter*,

> If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal.

*Id*., at 102–03 (emphasis added; internal citations omitted).

AEDPA affords deference to a state court's resolution of factual issues.  Under 28 U.S.C. § 2254(d)(2), a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless it is objectively unreasonable in light of the evidence presented in the state court proceeding.  *Miller–El v. Cockrell*, 537 U.S. 322, 343 (2003).  A federal habeas court must presume the underlying factual determination of the state court to be correct, unless the petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Miller–El*, 537 U.S. at 330–31.

*Summary Judgment*

In deciding a motion for summary judgment, the district court must determine whether the pleadings, discovery materials, and the summary judgment evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Once the movant presents a properly supported motion for summary judgment, the burden shifts to the nonmovant to show with significant probative evidence the existence of a genuine issue of material fact. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).

While summary judgment rules apply with equal force in a section 2254 proceeding, the rules only apply to the extent that they do not conflict with the federal rules governing habeas proceedings. Therefore, section 2254(e)(1), which mandates that a state court's findings are to be presumed correct, overrides the summary judgment rule that all disputed facts must be construed in the light most favorable to the nonmovant. Accordingly, unless a petitioner can rebut the presumption of correctness of a state court's factual findings by clear and convincing evidence, the state court's findings must be accepted as correct by the federal habeas court. *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004).

### Analysis

*The "Brady" Evidence*

Thornton was indicted as a co-defendant in the underlying capital murder case. A few days before petitioner's trial, she pleaded guilty to a reduced charge of aggravated robbery

in exchange for her agreement "to tell the truth" at petitioner's trial.  According to petitioner, Thornton's testimony elevated his offense to a capital murder charge.

Petitioner complains that the State violated *Brady* by withholding material evidence that Thornton had a serious mental illness both before and during the time she testified against petitioner, and was taking various medications.  (Docket Entry No. 11, p. 1.) Petitioner asserts that Thornton was suicidal and hospitalized shortly before the underlying offense of December 20, 2011, and was on psychiatric medications at jail when she testified against petitioner on June 3, 2014.  He alleges that, had the State disclosed this evidence prior to trial, he would not have been found guilty of capital murder.

In support of his claim, petitioner submits excerpts from Thornton's medical records during her pretrial detention at the Harris County Jail.  (Docket Entry No. 1, Appendix B.) The record excerpts, which cover December 6, 2012, through June 10, 2015, indicate that Thornton was taking medications such as Prozac, Thorazine, Elevil (amitriptyline), Klonopin, trazodone, and BuSpar at various times throughout her detention.  It is unclear from the records how long, or even if, she had been on any of these medications prior to her jail detention.  She reported being suicidal on October 17, 2013, and stated she had attempted suicide in jail in 2012.  *Id*., pp. 4–8, 14.  She further stated she had been hospitalized at "West Oaks in 2010 for suicidal attempt by OD."  *Id*., p. 15.  No specific excerpt covers her medical care on or around June 3, 2014, the date of her trial testimony.

Petitioner's trial counsel submitted an affidavit in support of federal habeas relief, wherein he testifies as follows:

I am [*sic*] represented Tony Escobar in his capital murder trial.  Tony was found guilty and automatically sentenced to life with the possibility of parole.

The main evidence against Tony at trial was the testimony of Amber Thornton. Amber was a co-defendant who testified that Escobar accompanied her and Joseph Facundo to the complainant's home on December 20, 2011, with the plan to rob him of drugs and money.  Facundo bludgeoned the complainant with a hammer, and later stabbed him with a sword.  Facundo and Thornton removed property from the home.

Prior to her testimony, Thornton pleaded guilty to aggravated robbery.  This was a reduction of her original capital murder charge.  After testifying for the State, Ms. Thornton received a 50-year sentence on the aggravated robbery. Charles Brown represented Ms. Thornton.

I specifically requested any exculpatory or impeachment information be provided to me by the State.  Prior to trial, the State confirmed on the record that it had complied fully with the requirements of *Brady v. Maryland*.

Amber Thornton was always represented by an attorney, thus preventing me from speaking to her.

I was never informed by the State that Amber Thornton was diagnosed with major depressive disorder, severe with psychotic.

I was never informed by the State that Amber Thornton was previously hospitalized in a psychiatric institution.

I was never informed by the State that Amber Thornton attempted suicide in 2011.
I was never informed by the State that Amber Thornton had a long history of taking Thorazine, Klonopin, Prozac, Elavil, and Trazodone.

Part of my trial strategy was to attack Amber Thornton's credibility because evidence that this murder was elevated to capital came only through Amber Thornton's testimony.

Amber Thornton's statements to the police and prosecutors were never consistent.

> *Had the State informed me of Amber Thornton's long psychiatric history, I would have hired an expert to consult and potentially testify how her mental health and long history of psychotropic medication could affect her memory and judgment.*

(Docket Entry No. 1-2, Exhibit J, emphasis added.)

Thornton testified against petitioner on June 3, 2014.  The trial record reveals the following relevant exchanges between Thornton and the State or defense counsel:

Q:      How old are you right now, Amber?

A:      I'm 24.

Q:      And I see that you are wearing a yellow Harris County Jail jumpsuit, or orange, right?

A:      Yes, sir.

Q:      Do you currently reside in the Harris County Jail?

A:      Yes, sir.

Q:      Have you resided there since your arrest in December of 2011?

A:      Yes, sir.

5 RR 55.

Q:      Now, Amber, are you currently on any kind of medication in the Harris County Jail?

A:      Yes, sir.

Q:      What are you on medication for?

A:      Anxiety and depression.

Q:      And do you think those medications are helping you?

11

A:      Yes, sir.

*Id*. at 59.

Q:      What medication are you on today, can you tell us?

A:      Thorazine, Klonopin, Lamictal.

Q:      What does that do?

A:      That's for mood stabilizer.

Q:      Okay. What else?

A:      That's it.

Q:      When did you take these medications?

A:      This morning.

Q:      Do you feel like you're able to understand the questions you're being asked today and answer them?

A:      Yes, sir.

Q:      Now, you were arrested on the 28th of December, 2011; is that correct?

A:      Yes, sir.

Q:      You have been in jail continuously since that time, almost three years?

A:      Yes.

*Id*. at 121–22.

Q:      Were you on the anxiety medications before you went to jail?

A:      No, sir.

Q:      So this is something you developed while in jail, the anxiety?

A:      Yes.

*Id*. at 127.

*Exhaustion*

Petitioner raised his *Brady* issue for the first time in his second application for state habeas relief, which was dismissed by the Texas Court of Criminal Appeals as an abuse of the writ. *See* TEX. CODE CRIM. PROC. art. 11.07 § 4.  Respondent argues that the claim is unexhausted, procedurally defaulted, and barred from consideration by this Court.

Before seeking review in federal court, a habeas petitioner must first present his claims in state court and exhaust all available state court remedies through proper adjudication on the merits. *See* 28 U.S.C. § 2254(b)(1)(A) (stating that habeas relief may not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State).  In Texas, the exhaustion requirement is satisfied if the substance of the federal habeas claim was presented to the Texas Court of Criminal Appeals in a procedurally proper manner through a petition for discretionary review or an application for writ of habeas corpus. *Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998).

A dismissal pursuant to art. 11.07 § 4, as in this case, "is an independent and adequate state ground for the purpose of imposing a procedural bar" in a subsequent federal habeas proceeding. *Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008); *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995).  Thus, petitioner here is precluded from federal habeas review of his *Brady* claim unless he can show cause for the default and resulting prejudice attributable to the default, or demonstrate that the Court's failure to consider the claims

13

would result in a fundamental miscarriage of justice.  *See Coleman v. Thompson*, 501 U.S. 722, 750–51 (1991); *Harris v. Reed*, 489 U.S. 255, 262 (1989); *Nobles v. Johnson*, 127 F.3d 409, 423 (5th Cir. 1997).

Petitioner in this proceeding must show that, because of the State's suppression of material evidence, he was unable to raise his *Brady* claim in his first application for state habeas relief.  Thus, the Court will consider the issues of cause and prejudice, or fundamental miscarriage of justice, in light of events in the case following Thornton's testimony of June 3, 2014.

*"Cause" and "Prejudice"*

Petitioner was convicted in 2014, and he filed his first application for state habeas relief two years later in 2016.  Two years after that, petitioner filed his second application for state habeas relief, asserting his *Brady* claim.  The application was dismissed as an abuse of the writ in December 2018, and petitioner filed the instant federal habeas petition nine months later in September 2019.  Despite Thornton's admissions during trial to having anxiety and depression and taking psychiatric medications for nearly three years at the time, petitioner did not raise any *Brady* objections at trial, nor did he pursue a motion for new trial predicated on *Brady* and Thornton's trial testimony.  To the contrary, petitioner did not raise his *Brady* claim until nearly four years after his conviction.

The parties' pleadings in this case focus on the interplay between *Brady* and the issue of procedural default.  The Court finds guidance in the Fifth Circuit Court of Appeals's

14

recent decision in *Speer v. Lumpkin*, ___F. App'x ___, 2020 WL 4778227 (5th Cir. Aug. 17, 2020), as follows:

> For *Brady* claims, the cause and prejudice inquiries largely parallel the merits. *Banks v. Dretke*, 540 U.S. 668, 691 (2004). Speer can show "cause" if "the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence." *Id*. And he can show "prejudice" if "the suppressed evidence is 'material' for *Brady* purposes." *Id*.
>
> We conclude that even if Speer can show cause—that is, suppression of impeachment evidence—he cannot show prejudice. Impeachment evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). We do not consider the suppressed evidence in a vacuum. Instead, its materiality "depends almost entirely on the value of the [undisclosed] evidence relative to the other evidence mustered by the [S]tate." *Rocha v. Thaler*, 619 F.3d 387, 396 (5th Cir. 2010) (quotations omitted). Evidence that "provides only incremental impeachment value . . . does not rise to the level of *Brady* materiality." *Miller v. Dretke*, 431 F.3d 241, 251 (5th Cir. 2005).

*Id*., at *5.

The Court is not persuaded by petitioner's attempts in this case to blame the State as the sole cause for his default. According to petitioner, he was unable to discover the factual basis for his *Brady* claim – that is, that Thornton had a history of mental illness and psychiatric medications – until after the denial of his first application for state habeas relief. However, the trial record itself shows that petitioner was aware no later than June 3, 2014, that Thornton had mental health issues and had been taking psychiatric medications for at least two and a half to three years. During her trial testimony on that date, Thornton testified that she was currently on medication at the Harris County Jail for anxiety and depression, and that she had taken mood stabilizers Thorazine, Klonopin, and Lamictal earlier that morning.

15

She further stated that she started taking the anti-anxiety medications while in jail, and that she had been in jail continuously for almost three years as of that date.  5 RR 59, 121–22, 127.  Defense counsel did not expand Thornton's testimony during cross-examination, nor did he follow up on her statement of having depression.  Even though Thornton testified to having taken the medications in jail for almost three years, petitioner did not pursue the issue for purposes of seeking a new trial, appeal, or initial state habeas relief.

Under these circumstances, petitioner does not show that "the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence," *Banks v. Dretke*, 540 U.S. 668, 691 (2004), and that the information was not available to him through due diligence.  *See United States v. Aubin*, 87 F.3d 141, 148–49 (5th Cir. 1996).  In short, petitioner does not show that he was unable to develop additional facts regarding Thornton's mental health and medication history for purposes of pursuing a *Brady* claim in his first application for state habeas relief.  Indeed, glaringly absent from petitioner's pleadings in this case are any statements as to *when* he first became aware of Thornton's allegedly suppressed mental illness and medication history, *why* he did not address the issue until that precise time, or *how* he became aware of the facts but could not before that point in time.  Absent this information, petitioner wholly fails to show that the sole reason for his failure to develop the facts in state court proceedings was the State's suppression of the relevant evidence despite his exercise of due diligence.

Further, petitioner does not meet his burden of demonstrating prejudice.  As noted in *Speer*, impeachment evidence is material under *Brady* "only if there is a reasonable

probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Speer*, at *5 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Trial counsel's affidavit here shows only that, had the State disclosed Thornton's mental health and history of psychotropic medication, he would have investigated how it could have affected her memory and judgment. However, petitioner presents no probative summary judgment evidence that Thornton's mental health and medications adversely affected her memory and judgment for purposes of her trial testimony against him.[2] That is, he does not establish a reasonable probability that, had the purported impeachment evidence been disclosed to the defense, the result of the proceeding would have been different. Thus, the record does not establish that petitioner was prejudiced by the State's nondisclosure of Thornton's mental illness history prior to trial. To the extent petitioner complains that the State violated *Brady* by not disclosing Thornton's alleged suicide attempts of 2010 and 2012, or her reports of feeling suicidal in October 2013, he again fails to show that, had this information been disclosed, the result of the proceeding would have been different.

Moreover, the trial record show that petitioner impeached Thornton on other issues several times during trial. Trial counsel impeached her with a prior inconsistent statement she made to a police sergeant, 5 RR 145–46; elicited her admission that she was on probation for a theft conviction, had multiple probation violations for smoking marijuana, and had lied

---

[2]Although petitioner submitted in his petition MedLine Plus printouts for many of the medications prescribed for Thornton during her detention, these printouts do not constitute probative summary judgment evidence as to whether they had any effect on Thornton's memory and judgment for purposes of impeaching her trial testimony.

to the Court and her probation officer about smoking marijuana. *Id*. at 149–150, 152. She further testified under cross-examination that she had been "buying a lot of cocaine" and had lied to a friend about petitioner's role in the offense. *Id*. at 153, 155–56. Despite petitioner's repeated impeachment of Thornton, the jury found him guilty of capital murder. Petitioner does not establish that, with the additional grounds for impeachment, the result of the proceeding would have been different.

Petitioner's information regarding Thornton's mental health, medications, and purported suicide attempts do not cause this Court to have a lack confidence in the outcome of his trial. *See Schlup v. Delo*, 513 U.S. 298, 316 (1995). Petitioner establishes neither cause nor prejudice for purposes of surmounting the procedural default of his *Brady* claim.

*Miscarriage of Justice*

In the alternative, a habeas petitioner can overcome a procedural default by demonstrating that the Court's failure to consider the defaulted claim would result in a fundamental miscarriage of justice. By "miscarriage of justice" is meant that the petitioner was actually innocent of the crime. *Sawyer v. Whitley*, 505 U.S. 333, 339–40 (1992); *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). A claim of actual innocence is "a gateway through which a habeas petitioner must pass to have his otherwise [procedurally] barred constitutional claim considered on the merits." *Herrera v. Collins*, 506 U.S. 390, 404 (1993). "Actual innocence" in this context refers to factual innocence and not mere legal sufficiency. *Bousely v. United States*, 523 U.S. 614, 623–24 (1998).

18

A habeas petitioner who seeks to surmount a procedural default through a showing of "actual innocence" must support his allegations with "new, reliable evidence" that was not presented in the underlying proceedings, and must show that it was more likely than not that, in light of the new evidence, no fact finder, acting reasonably, would have found him guilty beyond a reasonable doubt. *See Schlup v. Delo*, 513 U.S. 298, 326–27 (1995); *see also House v. Bell*, 547 U.S. 518 (2006).

Demonstrating an ability to impeach a witness is not "new, reliable evidence." *See Phillips v. Davis*, C.A. No. EP-18-284-FM, 2019 WL 4278834, at *7 (W.D. Tex. Sept. 9, 2019). The alleged new evidence here – that Thornton had a history of suicide attempts and major depression with psychotic elements treated with numerous medications – does not demonstrate, or support, petitioner's factual innocence in this case. The Court is not persuaded that, armed with evidence of Thornton's mental illness history, it is more likely than not that no fact finder, acting reasonably, would have found him guilty beyond a reasonable doubt.

Petitioner fails to establish a fundamental miscarriage of justice, and his *Brady* claim remains procedurally defaulted and barred from consideration by this Court.

### *Conclusion*

The Court ORDERS as follows:

1.   Respondent's motion for summary judgment (Docket Entry No. 8) is GRANTED.

2.   This case is DISMISSED WITH PREJUDICE.

19

3.      Any and all pending motions are DENIED.

4.      A certificate of appealability is DENIED.

5.      Petitioner's habeas petition appendix (Docket Entry No. 1-2) contains medical records that should be filed under seal.  The Clerk of Court is ORDERED to place Docket Entry No. 1-2 under seal.  Docket Entry No. 1-2 shall remain under seal until further order of the Court.

Signed at Houston, Texas, on October 28, 2020.

Gray H. Miller
Senior United States District Judge